## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH



**NO. 2-08-160-CR**

JOSEPH MARTIN BELSON                                                    APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

------------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION AND PROCEDURAL BACKGROUND

This is Appellant Joseph Martin Belson's second appeal. In his first appeal, this court reversed Belson's convictions for two counts of burglary of a habitation, for which he was sentenced to forty-five years' and twenty years' confinement, respectively. We held that double jeopardy barred Belson's conviction on the second count and ordered the conviction and sentence on

---

[1] *See* Tex. R. App. P. 47.4.

that count vacated. We sustained one of Belson's issues challenging his conviction on the first count, reversed the trial court's judgment on that count, and remanded the case to the trial court for a new trial on the first count. *Belson v. State*, No. 02-05-00465-CR, 2006 WL 2925015, at *3 (Tex. App.—Fort Worth Oct. 12, 2006, pet. ref'd) (mem. op., not designated for publication). Upon retrial, the jury found Belson guilty of burglary of a habitation, and the trial court sentenced him to fifty years' confinement.

In three points, Belson now appeals that conviction and sentence, arguing that the evidence is legally and factually insufficient to support his conviction and that the trial court failed to rebut a presumption of vindictiveness in sentencing Belson to a higher sentence upon retrial, fifty years' confinement as opposed to the forty-five-year sentence imposed in Belson's first trial. We will affirm.

## II. FACTUAL BACKGROUND

### A. Sally Johnson's[2] Story

Sally testified that on November 2, 2004, around 1:00 a.m., she was asleep in her bedroom when she was awakened by her dog's barking and growling. After unsuccessfully trying to quiet her dog, Sally noticed a light at

---

[2] This is a pseudonym given to the victim at the outset of the police investigation and used throughout the trial.

2

the foot of her bed. Sally got up to investigate and encountered Belson in the hallway. Sally recognized Belson as a man she had observed walking by her house on a weekly basis for several months,[3] but she did not know his name. Sally felt "[s]heer terror, panic" when she saw who it was; she knew Belson's intentions were not good.

Sally testified that Belson told her that he was not there to hurt her; he was just there to tell her that her front door was open[4] and that someone could

---

[3] Sally said that she got off work some days around 2:00 p.m. and found it strange that Belson always happened to be coming by her house at that exact time. As she would walk to her mailbox, he would pass her and then stop and stare at her. As she would walk off, he would turn around and stop and stare again. Sally said that Belson's blank stares made her very uncomfortable. In order to break the uncomfortableness, Sally testified that she would say, "[H]ey, how's it going?" but Belson would just continue to stare at her.

[4] Sally could not specifically recall locking the door that night but said that it was her habit to lock the door. She did not believe that her front door had been left open because it would have been cold in her house and, based on past experience, her dog would have gone outside. She said that her front door had never spontaneously opened and that although the lock on the front door had stopped working about a week before the incident, it had been repaired.

Robin Roberts, who stayed in Sally's home from early September 2004 through the end of October 2004, testified that in late October she had noticed that Sally's front door had stopped functioning properly. Roberts saw that the weather stripping had been "rubbed down, jostled[,] or something" and that the doorknob could be turned without engaging the locking mechanism. Roberts thought that the lock had been tampered with and told Sally about the problem. Sally had the lock repaired that same evening. After the lock was repaired, Roberts did not notice any other problems with the door.

have come in and raped her. Sally did not believe that Belson was genuinely concerned or was there simply to warn her about a danger. Sally recalled repeating, "[O]kay, thank you," over and over because she was "absolutely terrified" and knew in her mind that Belson was there with "very bad intentions." Sally told herself that she would tell Belson whatever he wanted to hear until she could figure out what she was going to do to get out of the predicament.

Sally said that Belson was just a few inches from her face for what felt like an hour. While they were in the hallway near the front door, Belson kept repeating himself, and Sally kept eye contact with him. Sally tried to move toward the front door, but Belson had a "very strong hold" of her arm. As they neared the front door, Sally saw that it was open a little bit but not enough to get through.

A few feet from the front door, Belson stopped and asked Sally if she had five minutes to talk. Sally said, "Sure," and asked if they could go outside. Belson looked over at the door and "kind of smiled like there was a possibility of going outside." But then he said that it was too cold, he stopped smiling, and he slammed the door shut. Belson blocked in Sally against a wall. Sally felt sure Belson was going to rape her; she thought he had been stalking her for

4

the past six months, walking by her house repeatedly. She testified that she was scared to death.

While Belson pinned Sally against the wall, he told her that he had had a sex fantasy dream about her. Belson said that in his dream he had walked by Sally's house numerous times and saw her door open. So according to Belson, the evening's events were "deja vu," and he had entered Sally's house.

Sally could not remember the exact sequence of events, but Belson became physically aggressive, grabbing her on her rear end over her pajama pants and placing his hand on her crotch. Belson told Sally something to the effect that, for a woman her age, she still looked pretty good. Sally felt Belson was going to force her to have sex with him. Belson then got down on his knees in front of her and propositioned Sally for oral sex. Sally tried to push his head away.

Belson then told Sally that she was going to give him a "blow job," which she did not interpret as a request. Belson raised his shirt up; his pants were already undone and were around his knees, and his penis was exposed and fully erect. When Belson attempted to stand up, however, his pants tangled around his knees. Sally leaped over him, ran to the phone in the kitchen, and dialed 911. She yelled at Belson to get out of her house and told him that she was calling the police. Belson eventually moved toward the front door and opened

5

it; Sally charged him, pushed him out, slammed the door, and locked it. The police arrived shortly thereafter.[5]

The back door was open when the police arrived. Sally explained that before the police had arrived, she had let the cat out the back door or opened the door to see if the cat had gone out. Sally testified that Belson did not have a key to her house and that she never gave Belson permission to enter her house. Sally never indicated to Belson that it was permissible for him to perform oral sex on her or that she would agree to give him oral sex. Sally gave the police a description of what Belson was wearing, and the police told Sally to call if she saw Belson again.

The evening after the assault, Belson returned to Sally's house. Sally was standing in front of her house talking to her estranged husband. Belson told Sally that he had come to check on her to see how she was doing. Sally started screaming for Belson to leave. As Belson walked toward Sally, she continued to scream. Belson's demeanor changed, and he asked what the police had told her about him, "[l]ike they already knew something." Sally's

---

[5] Sally had not been able to talk to the 911 operator because her phone's battery was low, so until the police arrived, she did not know that her call to 911 had gone through.

6

husband spoke with Belson, and Belson left. Sally did not call the police until the next morning.

## B. The Investigation

Officer Christopher Ceballos with the City of Arlington Police Department was dispatched to Sally's residence around 1:00 a.m. on the day of the burglary. Officer Ceballos checked around the house and discovered that the back glass door was open; Sally said that she had let her cat out. He thought it was odd that Sally would open the back door but said that "due to her state I just don't think she was really thinking." Officer Ceballos found no sign of forced entry. He questioned Sally, who was very upset, and obtained a physical description of the intruder. His report stated that Belson told Sally, "[P]lease let me touch you."

Detective Becky Szatkowski received the case when she arrived for work on November 2, 2004, and determined that further follow-up was needed. Detective Szatkowski went to Sally's house and spoke with her and thereafter called the crime scene unit to look for DNA evidence and fingerprints at the scene. The crime scene investigators collected Sally's pajamas, a rug or two,[6]

---

[6] While police were at Sally's house, her dog began scratching on the rug, and Sally said that her dog had never scratched at the rug before. Detective Szatkowski thought that there might be evidence on the rug that was alerting the dog.

7

and fingerprints from the door frame. Detective Szatkowski subsequently asked Sally to come to her office where she showed Sally a photographic line-up, but Sally determined that none of the photos matched the intruder.

Later, Detective Wade located a photo of Belson, and both Detective Wade and Detective Szatkowski went to Sally's house with a photographic line-up to see if Sally could identify the intruder. Detective Szatkowski testified that when she arrived, Sally pointed to the photo of Belson as the person who had been in her house.

Constance Patton, who is employed as a senior biologist and DNA technical leader for the Fort Worth Medical Examiner's Office, testified that the pair of pajama pants that were tested contained Sally's DNA and had a stain that confirmed the presence of semen; however, Belson was excluded as the contributor of the semen. The pajama top and rugs did not contain any DNA.

Ignacio Acosta, who was formerly a crime scene investigator and latent print examiner with the Arlington Police Department, testified that he received a call from Detective Szatkowsi asking him to process a crime scene. Acosta lifted two impressions from the bedroom door frame, and they matched Belson's fingerprints. However, Acosta was not able to get any prints off the front door or off of a lighter that was found on a shelf in the entryway.

## C.    Belson's Testimony

Belson testified at trial and described Sally as his "buddy."  Belson said that he lived near Sally and that he had met her through one of his friends who lived across the street from her.  Belson said that Sally had told him her name one day when he walked by her mailbox and that he had told Sally the first day he met her that she had a nice figure and was a very attractive lady.  Belson asked Sally if she lived by herself, and Sally told him that she had been divorced for five or six years and that she lived in the house with her son.  Belson asked Sally if he could come by and speak to her later.  Belson recollected that Sally pointed out her van and told him that she was normally home after 5:00 p.m. and to come by then.

On November 2, 2004 after midnight, Belson said that his girlfriend, Laura, called and said that she could not come over that night.  Belson said that he could have gone to her house for a "booty call" but that he was not "in the mood for anything, not initially."  Belson testified that later that night he decided to walk to a nearby convenience store to purchase cigarettes; on his way, he passed Sally's house and noticed that the front door was open.  Belson suspected that Sally's open door was a "setup."  When asked what he meant by "setup," Belson said,

I don't necessarily mean somebody purposely putting you in a bad predicament. I mean, a setup as in trouble. That looks like trouble. The front door wide open, 1:00 o'clock in the morning, there's nobody around. It's just front door wide open.

That looks like a threshold of negative stress. So, you know, I don't need it. I already got problems.[7] All a person got to say is I blinked at them and I didn't need that.

. . . .

Just the whole accusation and the whole, you know, trauma behind what I'm going through.

Belson said that on his way back from the store he stopped at Sally's house and rang the doorbell several times; no one answered, so he walked home.

Belson admitted that although he had seen Sally's front door open both on his way to the store and on his way back home, he did not call the police when he arrived home because he was trying not to be involved.

Belson claimed he realized when he got home that the store clerk had not given him his cigarettes, so he left to walk back to the convenience store. As he walked by Sally's house, he noted that her front door was still open. Belson said that he again rang the doorbell and that this time he overheard moaning inside. Belson claimed that he began yelling into the house and that Sally came

---

[7] Belson admitted that he had been convicted of indecent exposure on June 7, 1996; on October 11, 1996; and on September 8, 1997. Belson also admitted that on October 26, 1998, he had been convicted of the felony offense of failure to register as a sex offender.

to the door. Belson then stepped inside, though Sally did not invite him in. Belson said that when he crossed the threshold of Sally's house,[8] he did not have the intent to have a sexual relationship with Sally. Belson said that he talked to Sally in the entryway where the porch light was shining because he wanted to make sure that she saw exactly who he was. He gave Sally his driver's license,[9] made sure she was okay, and suggested that she call the police. Belson said that Sally gave him a hug right after he had checked to see if she was all right and said that his hand had accidentally dropped and touched her leg.

Belson asked Sally if there was a possibility that they could get to know each other better and said that it did not have to be immediately. Specifically, Belson said, "[M]aybe I'm just out of line, you know, or, you know, stop me if I'm going too far, but, you know, I was just wondering, you know, if you and I could ever, you know, possibly have some kind of relationship." Belson testified that he objected to talking outside where it was cold but said that he offered to leave if he was bothering Sally. Belson said that he did not get the

---

[8] Belson testified that he never went beyond the entryway, that he never touched the doorway where the fingerprints were obtained, that he never went into Sally's bedroom, and that the lighter that police found was not his.

[9] Sally testified that she did not recall that Belson showed her his driver's license until the police told her that she had said that.

impression that Sally wanted him to leave or was scared of him; Belson said that Sally never asked him to leave and never acted like she did not want him there.

According to Belson, when Sally agreed to talk with Belson for a moment, he believed she wanted to have sex with him. He told her things that he would say to a woman that he wanted to have sex with and thought that she seemed flattered. Belson testified he requested that he be permitted to perform oral sex on Sally, kneeled down in front of her, and claimed that she put her hands on his shoulders but was not pushing him away. Belson testified that Sally told him that right then would not be a good time for that, but he claimed she never said "no."

Belson testified that for thirty to sixty minutes he and Sally talked; he claimed "it was really just me talking to her and explaining to her the deja vu situation." Belson initially testified that he had dreamed about Sally, that it was a sexual dream, and that this was deja vu. But later, Belson said that he had a sexual dream about a woman in that house but that it was *not* Sally and that the woman in the dream never actually had sex with him.

Belson said that eventually he left Sally's house on his own; Sally did not push him out of her house. But later Belson testified that at the "very, very

12

end" of their conversation, Sally said that he needed to leave or that she would call the police.

The next evening, Belson stopped and talked to Sally to make sure that she was okay. Belson said that Sally's husband talked to him as he was leaving but did not ask him to leave.

The following day, police arrested Belson. Belson gave police a written statement, saying that he did not think that he had done anything wrong.

## D. Verdict and Sentence

After hearing the above testimony, the jury found Belson guilty. The trial court thereafter sentenced Belson to fifty years' imprisonment.

### III. SUFFICIENT EVIDENCE TO SUPPORT CONVICTION

In his first and second points, Belson argues that the evidence is legally and factually insufficient to support his conviction for burglary of a habitation.

## A. Legal Sufficiency Standard

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

13

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would be one

14

that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Malik*, 953 S.W.2d at 240. However, we may not affirm a conviction based on legal or factual grounds that were not submitted to the jury. *Malik*, 953 S.W.2d at 238 n.3. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. In determining the legal sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

**B.    Factual Sufficiency Standard**

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id.* We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in

16

the evidence. *Id.* We may not simply substitute our judgment for the factfinder's. *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id.* at 9. Our deference in this regard safeguards the defendant's right to a trial by jury. *Lancon,* 253 S.W.3d at 704.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). Moreover, an opinion reversing and remanding on factual insufficiency grounds must detail all the evidence and clearly state why the finding in question is factually insufficient and under which ground. *Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); *Johnson*, 23 S.W.3d at 7.

**C. Law**

A person commits burglary if, without the effective consent of the owner, he enters a habitation with the intent to commit a felony, theft, or an assault. Tex. Penal Code Ann. § 30.02(a)(1) (Vernon 2003). A person commits the offense of sexual assault if he intentionally or knowingly "causes the penetration of the anus or sexual organ of another person by any means, without that person's consent; causes the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent; or causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor." Tex. Penal Code Ann. § 22.011(a)–(c) (Vernon Supp. 2008).

Intent is an essential element of the offense of burglary, which the State must prove beyond a reasonable doubt. *LaPoint v. State*, 750 S.W.2d 180, 182 (Tex. Crim. App. 1986); *Coleman v. State*, 832 S.W.2d 409, 413 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd). A defendant's intent to commit a felony must exist at the time of and accompany the entry into the habitation. *Conrad v. State*, 154 Tex. Crim. 624, 626, 230 S.W.2d 225, 226 (1950). The jury is exclusively empowered to determine the issue of intent, and the events of a burglary may imply the intent with which the burglar entered. *Coleman*,

18

832 S.W.2d at 413. A defendant's intent to commit an offense may be inferred from his acts, words, and conduct. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

### D. Legally Sufficient Evidence

Here, the indictment charged Belson with intentionally or knowingly, without the effective consent of the owner, entering a habitation with intent to commit sexual assault. The record reveals that Belson admitted that Sally did not consent to his entry. Thus, the crux of Belson's legal sufficiency argument focuses not on the entering-a-habitation prong of the offense but on the with-intent-to-commit-sexual-assault prong of the burglary charge as alleged in the indictment. Specifically, Belson argues that there was no conclusive testimony that he either entered Sally's home with the intent to commit sexual assault or that he attempted to commit sexual assault when he was inside.

The jury heard evidence that for approximately six months prior to the burglary, Sally saw Belson appear outside her house when she arrived home from work; Belson would stare at her. The first time Sally noticed Belson walking by her mailbox, Belson told her that she had a nice figure and asked if she lived alone. On the night in question, Belson saw Sally's open door and testified that it looked like trouble but that he did not call the police; instead, he went inside and told Sally that someone could have raped her. Belson told

19

Sally how this was deja vu because he had a sexual fantasy dream about Sally in which he had oral sex with her. Sally testified that during the burglary Belson grabbed her crotch, told her she looked good for her age, grabbed her arm, pinned her against a wall, got down on his knees, solicited oral sex, and showed Sally his erect penis. Sally identified Belson in a photographic line-up, and the physical evidence revealed Belson's fingerprints matched those lifted from Sally's bedroom door frame.

Having reviewed the evidence in the light most favorable to the jury's verdict, we hold that there is legally sufficient evidence from which the jury could have reasonably inferred that Belson intended to sexually assault Sally when he entered her home without her consent. *See Caballero v. State*, No. 04-08-00278-CR, 2009 WL 962462, at *3 (Tex. App.—San Antonio Apr. 8, 2009, no pet. h.) (mem. op.) (holding legally sufficient evidence existed that appellant intended to sexually assault victim when appellant had been seen around victim's house on multiple occasions, entered victim's residence at nighttime with two bottles of champagne, locked the doors, armed himself with a kitchen knife, grabbed the victim and asked her to have a drink with him, and tried to stop victim from escaping); *Davis v. State*, No. 02-02-00497-CR, 2004 WL 914987, at *4–5 (Tex. App.—Fort Worth Apr. 29, 2004, no pet.) (mem. op., not designated for publication) (holding legally sufficient evidence existed

20

to support intent element of conviction for burglary of a habitation with intent to commit sexual assault).

### E.    Factually Sufficient Evidence

Under his factual sufficiency analysis, Belson argues that he had permission to come by Sally's house, that the door was open, and that the DNA evidence excluded Belson. With regard to the entering-a-habitation prong of the offense, the jury had before it Sally's testimony that she had never given Belson a key or permission to come into her house, as well as Belson's testimony that Sally did not invite him into her house on the night in question but had previously told him that she was normally home after 5:00 and that he could come by then.

With regard to the with-intent-to-commit-sexual-assault prong, the jury had before it testimony from Belson that he had a girlfriend; that he stood in the light and gave Sally his driver's license so that she would see who was in her house; that he did not have the intent to commit sexual assault when he crossed the threshold of Sally's house; that when he told her things that he would say to a woman that he wanted to have sex with, she seemed flattered; that he never asked Sally to perform oral sex on him; that he never exposed himself to her; that he never dropped his pants; that he never asked her if she wanted to have sex; that he never said that he wanted to have sex with her;

21

that he never physically or verbally forced Sally to do anything; that he never grabbed Sally's crotch; and that he never forced his hands or any part of his body onto Sally. The record also revealed (1) that Belson argued it did not make sense for him to leave fingerprints in Sally's house and then tell her to call the police, and (2) that Sally failed to call the police back after she thought her initial phone call did not go through and waited one day before calling the police after Belson's return visit to her house.

The jury also had before it all of Sally's testimony detailing Belson's sexual advances, which directly contradicted Belson's testimony, as well as physical evidence that Belson's fingerprints matched those that were lifted from Sally's bedroom doorway but that he had been excluded as the contributor of the sample of semen found on Sally's pajamas. Viewing the evidence in a neutral light, we cannot conclude that the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. Assuming the jury chose to believe Sally's version of the events, the jury could have reasonably inferred from Belson's actions that he had entered Sally's home without her consent and with

22

the intent to sexually assault her. We therefore hold that the evidence is factually sufficient to support Belson's conviction. *See Caballero*, 2009 WL 962462, at *3; *Davis*, 2004 WL 914987, at *4–5; *Granados v. State*, No. 02-03-00082-CR, 2004 WL 742936, at *4–5 (Tex. App.—Fort Worth 2004, no pet.) (mem. op., not designated for publication) (holding evidence factually sufficient to prove appellant intended to commit sexual assault when he entered apartment). We overrule Belson's first and second points.

### IV. REBUTTED PRESUMPTION OF VINDICTIVENESS

In his third point, Belson complains that the trial court sentenced him to a higher sentence on retrial without just cause and without rebutting the presumption of vindictiveness. Specifically, Belson relies on *North Carolina v. Pearce*, 395 U.S. 711, 89 S. Ct. 2072 (1969), arguing that the trial court improperly increased his sentence on retrial even though there was no justification for doing so.

The court in *Pearce* held that whenever a judge imposes a more severe sentence upon a defendant whose original conviction was set aside at his own behest, the judge's reasons for doing so must appear on the record. *Id.* at 726, 89 S. Ct. at 2081. The reasons for the increased sentence must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing; in addition, the

factual data upon which the increased sentence is based must be made part of the record so that the increased sentence may be fully reviewed on appeal. *Id.*, 89 S. Ct. at 2081. The court held this prevents vindictiveness on the part of the trial court, as due process requires that vindictiveness against a defendant for having successfully attacked his first conviction play no part in the sentence he receives after a new trial. *Id.* at 725, 89 S. Ct. at 2080.

In some instances, the appellant is entitled to a presumption of vindictiveness, and therefore the rule in *Pearce* automatically applies. *See U.S. v. Goodwin*, 457 U.S. 368, 373, 102 S. Ct. 2485, 2488 (1982). However, in a subsequent opinion the Supreme Court held the following:

> While the *Pearce* opinion appeared on its face to announce a rule of sweeping dimension, our subsequent cases have made clear that its presumption of vindictiveness "do[es] not apply in every case where a convicted defendant receives a higher sentence on retrial." As we explained in *Texas v. McCullough*, "the evil the [*Pearce*] Court sought to prevent" was not the imposition of "enlarged sentences after a new trial" but "vindictiveness of a sentencing judge." Because the *Pearce* presumption "may operate in the absence of any proof of an improper motive and thus . . . block a legitimate response to criminal conduct," we have limited its application, like that of "other 'judicially created means of effectuating the rights secured by the [Constitution],'" to circumstances "where its 'objectives are thought most efficaciously served.'" Such circumstances are those in which there is a "reasonable likelihood" that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority. Where there is no such reasonable likelihood, the burden remains upon the defendant to prove actual vindictiveness.

24

*Alabama v. Smith*, 490 U.S. 794, 799–800, 109 S. Ct. 2201, 2204–05 (1989) (internal citations omitted). Thus, a party is entitled to a presumption of vindictiveness (thus invoking the *Pearce* rule) unless the State can show, based on the record, that there is no reasonable likelihood of vindictiveness. *Jimenez v. State*, No. 04-08-00121-CR, 2009 WL 700655, at *5 (Tex. App.—San Antonio Mar. 18, 2009, no pet. h.) If the State shows no reasonable likelihood of vindictiveness, the presumption is rebutted and the *Pearce* rule does not apply; however, the defendant may still obtain relief through a showing of actual vindictiveness upon resentencing. *Id.*

In this case, the same judge presided over both trials. After the first trial, Belson was sentenced to forty-five years' confinement on the first count of his indictment. At the conclusion of the second trial, again on the first count of his indictment, the trial court sentenced Belson to fifty years' confinement. After the trial court imposed the fifty-year sentence, the following occurred on the record:

> [APPELLANT'S COUNSEL]: Judge, I have one objection to the Court's sentence.
>
> THE COURT: Go ahead.
>
> [APPELLANT'S COUNSEL]: I would ask the Court [to] reconsider and sentence the Defendant to no more than 45 years, which is the sentence he previously received from the Court, and

I would submit to the Court that there's been no material change in the testimony in this case that would substantiate that.

THE COURT: The Court bases its ruling upon the testimony and the behavior of the Defendant both throughout the trial as well as his demeanor while testifying in court, and the Court finds that the punishment range is within -- the punishment assessed is within the statute allowed -- the punishment range allowed by statute, and that is what I'm basing my decision on, as well as the totality of the evidence that was submitted at trial.

As demonstrated by the record, the trial court pointed to Belson's behavior and demeanor at the second trial as the reason for the five-year increase in his sentence. We hold that because the objective reasons affirmatively appear on the record for the trial court's decision to sentence Belson to five additional years' confinement, there is no reasonable likelihood of vindictiveness. *See, e.g., Smith*, 490 U.S. at 801, 109 S. Ct. at 2206 (recognizing valid basis for increase in sentence on retrial to be "defendant's conduct during trial may give the judge insights into [defendant's] moral character and suitability for rehabilitation"); *Amaya v. State,* 759 S.W.2d 737, 740 (Tex. App.—El Paso 1988, pet. ref'd) (recognizing valid basis for increase in sentence on retrial "would arise where the second, post-appeal evidentiary presentation . . . cast the defendant . . . in a much more unfavorable light"); *see Jiminez*, 2009 WL 700655, at *5–6 (holding no "reasonable likelihood" of vindictiveness existed when trial court had granted defendant's motion for new

26

trial); *Webb v. State*, No. 13-03-00041-CR, 2006 WL 3525427, at *6 (Tex. App.—Corpus Christi Dec. 7, 2006, pet. ref'd) (mem. op., not designated for publication) (holding any presumption of vindictiveness was rebutted when trial court stated on the record that there was "a substantial difference in the evidence presented").  Belson points to no actual evidence of vindictiveness. We therefore overrule his third point.

## V. CONCLUSION

Having overruled all three of Belson's points, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  May 28, 2009

27